Opinion for the court filed by Circuit Judge RADER. Opinion dissenting in part filed by Circuit Judge MOORE.
RADER, Circuit Judge.
On summary judgment, the United States District Court for the District of Delaware held U.S. Patent Nos. 6,484,203 (“the '203 patent”), 6,708,212 (“the '212 patent”), 6,321,338 (“the '338 patent”), and 6,711,615 (“the '615 patent”) invalid as anticipated by SRI International, Inc.’s (“SRI’s”) own prior art publication “Live Traffic Analysis of TCP/IP Gateways” (“Live Traffic”). SRI Int’l, Inc. v. Internet Sec. Sys., Inc., 456 F.Supp.2d 623 (D.Del.2006). The district court also granted summary judgment of invalidity of the '212 patent as anticipated by a paper entitled “EMERALD: Event Monitoring Enabling Responses To Anomalous Live Disturbances” (“EMERALD 1997”). Id. Because the district court correctly determined that the EMERALD 1997 paper anticipated the '212 patent, this court affirms that decision. However, due to genuine issues of material fact about the public accessibility of the Live Traffic paper, this court vacates and remands the district court’s other determination.
I
SRI owns the '203, the '212, the '338, and the '615 patents. The SRI patents relate to cyber security and intrusion detection. Specifically, the patents describe “[a] computer-automated method of hierarchical event monitoring and analysis within an enterprise network including deploying network monitors in the enterprise network, detecting, by the network monitors, suspicious network activity based on analysis of network traffic data.” '203 Patent Abstract. All four patents originated from a November 9, 1998 application by inventors Phillip Porras and Alfonso Valdes.
A. EMERALD 1997
SRI had done considerable research on network intrusion detection. In fact, SRI’s Event Monitoring Enabling Responses to Anomalous Live Disturbances (“EMERALD”) project attracted considerable attention in this art field. SRI first received funding for the EMERALD project in August 1996 and almost immediately began publicizing EMERALD at a workshop in November 1996. In June 1997, SRI posted an EMERALD 1997 paper on its SRI file transfer protocol[1] (“FTP”) server. In October 1997, SRI presented EMERALD 1997 at the 20th National Information Systems Security Conference. The conference published the peer-reviewed article.
The EMERALD 1997 paper contains a detailed description of a tool for tracking malicious activity across large networks. Furthermore, the EMERALD 1997 paper discusses SRI’s early research in Intrusion Detection Expert System (“IDES”) technology. The paper then explains the development of the Next Generation IDES (“NIDES”). This technology uses a wide range of multivariate statistical measures *1189 to profile user behavior and detect anomalies in network traffic. The EMERALD 1997 paper describes the use of NIDES to detect network anomalies. EMERALD 1997 also teaches signature analysis, among other analysis engines. The EMERALD 1997 paper and the '212 specification contain some overlapping material. For instance, both the '212 patent specification and the EMERALD 1997 article feature two nearly identical figures. Figures 1 and 2 in the EMERALD 1997 paper are nearly identical to Figures 2 and 3'from the '212 patent, shown below.

EMERALD 1997

[[Image here]]
[[Image here]]
The EMERALD 1997 paper and the '212 patent specification also share overlapping text. The paper and the specification contain similar descriptions of the NIDES algorithm for statistical detection. The paper also discusses changes to the algorithm to accommodate network traffic. SRI Int’l, Inc., 456 F.Supp.2d at 633. *1190 Specifically, EMERALD 1997 and the '212 patent both state:
Profiles are provided to the computational engine as classes defined in the resource object 32. The mathematical functions for anomaly scoring, profile maintenance, and updating do not require knowledge of the data being analyzed beyond what is encoded in the profile class. Event collection interoperability supports translation of the event stream to the profile and measure classes. At that point, analysis for different types of monitored entities is mathematically similar. This approach imparts great flexibility to the analysis in that fading memory constants, update frequency, measure type, and so on are tailored to the network entity being monitored.
SRI Int'l, Inc., 456 F.Supp.2d at 633 fn. 22; '212 Patent col.7 II. 13-24.
During prosecution of the '212 patent, SRI disclosed the EMERALD 1997 paper in its Information Disclosure Statement, listing the paper in the patent’s Other Publications section. The trial court found that “[SRI] does not argue that the EMERALD 1997 paper fails to disclose each of the limitations of the asserted claims of the '212 patent.” Id. at 632. Instead, SRI contends that the EMERALD 1997 paper is not an enabling disclosure with respect to the '212 patent. On this basis, SRI challenges the district court’s grant of summary judgment.
B. The Live Traffic Paper
The inventors drafted the Live Traffic paper based on the EMERALD project. Mr. Porras and Mr. Valdes authored the paper in 1997. SRI displayed the paper on its web site on November 10, 1997. The four patents in this case incorporate the paper by reference. Furthermore, SRI listed the Live Traffic paper in its information disclosure to the government agency that funded some of SRI’s cyber security research.
SRI filed its patent application on November 9, 1998, one day before the critical date of November 10. The Live Traffic paper, as published in the December 12, 1997 proceedings of the 1998 Symposium on Network and Distributed Systems Security (“SNDSS”), was cited in the Information Disclosure Statement of the patents-in-suit.
The Internet Society (“ISOC”) posted the 1998 SNDSS call for papers on its web site. The call for papers stated that all submissions were to be made via electronic mail by August 1, 1997 with a backup submission sent by postal mail. The call for papers announcement did not include any information on confidentiality of paper submissions. On August 1, 1997, Mr. Por-ras sent an email to Dr. Bishop, the Program Chair for SNDSS, in response to the SNDSS call for papers. Mr. Porras attached the Live Traffic paper to his email. Mr. Porras stated that SRI would make a copy of the Live Traffic paper available on the SRI FTP server as a backup. He included the specific FTP address, ftp://ftp.csl.sri.com/pub/emerald/ndss98.ps, in the email.
The following listings show an index of the SRI FTP server:
*1191 [[Image here]]
[[Image here]]
The record reflects seven instances in which Mr. Porras previously directed people to the EMERALD subdirectory to find other papers related to the EMERALD project. In four instances, Mr. Porras provided the full path and filename of the paper. In every instance, Mr. Porras directed the people to a specific paper, which included the term “emerald” in the filen-ame. SRI brought an action against defendants Internet Security Systems, Inc.[2] (“ISS”) and Symantec Corporation (“Sym-antec”) for infringement of the '203, the *1192 '212, the '338, and the '615 patents. Defendants moved for summary judgment that each of the four patents-in-suit is invalid under 35 U.S.C. § 102(b). The Live Traffic paper served as the prior art for the summary judgment motion. Defendants also moved for partial summary judgment that the EMERALD 1997 paper was enabling and thus constituted anticipatory prior art.
SRI countered with a motion for partial summary judgment that the Live Traffic paper did not qualify as a printed publication under 35 U.S.C. § 102(b). SRI also moved for partial summary judgment that the EMERALD paper did not anticipate.
The district court ruled that the Live Traffic paper was a printed publication that anticipated all asserted claims of the four patents-in-suit. The trial court also determined that the EMERALD 1997 paper was enabling and anticipated the '212 patent. SRI appeals the district court’s grant of summary judgment of invalidity as to the Live Traffic paper and the EMERALD 1997 paper. This court has jurisdiction under 28 U.S.C. § 1295(a)(1).
II
This court reviews a district court’s grant of summary judgment without deference, reapplying the same standard as the district court. Bruckelmyer v. Ground Heaters, Inc., 445 F.3d 1374, 1377 (Fed.Cir.2006). “Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c).” Id. “Whether an anticipatory document qualifies as a ‘printed publication’ under § 102 is a legal conclusion based on underlying factual determinations.” Cooper Cameron Corp. v. Kvaerner Oilfield Prods., 291 F.3d 1317, 1321 (Fed.Cir.2002).
A. EMERALD 1997
As a matter of law, this court must review the decision that the EMERALD 1997 publication disclosed sufficient information to enable use of this prior art to invalidate the '212 patent. The trial court determined that the EMERALD 1997 paper anticipated the '212 patent, rendering the patent invalid under 35 U.S.C. § 102(b). “A [patent] claim is anticipated only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference.” Verdegaal Bros. v. Union Oil Co. of Cal., 814 F.2d 628, 631 (Fed.Cir.1987).
“[SRI] does not argue that the EMERALD 1997 paper fails to disclose each of the limitations of the asserted claims of the '212 patent. Rather, [SRI] asserts that EMERALD 1997 cannot anticipate claim 1 of the '212 patent because it does not provide an enabling disclosure of the claimed invention.” SRI Int’l, Inc., 456 F.Supp.2d at 632. “The standard for enablement of a prior art reference for purposes of anticipation under section 102 differs from the enablement standard under 35 U.S.C. § 112.” Novo Nordisk Pharm., Inc. v. BioTechnology Gen. Corp., 424 F.3d 1347, 1355 (Fed.Cir.2005). “Significantly, [this court has] stated that ‘anticipation does not require actual performance of suggestions in a disclosure. Rather, anticipation only requires that those suggestions be enabled to one of skill in the art.’ ” Id. (internal quote from Bristol-Myers Squibb Co. v. Ben Venue Labs. Inc., 246 F.3d 1368, 1379 (Fed.Cir. 2001)).
On summary judgment, the district court found that no reasonable jury could conclude that the EMERALD 1997 paper was a non-enabled “proposal” or an “intent to try” statistical profiling of network traf- *1193 fie. SRI Int'l, Inc., 456 F.Supp.2d at 635. The district court “finds the similarity in disclosure between EMERALD 1997 and the specification of the '212 patent convincing with respect to enablement.” Id. at 634. Thus, “if the specification of the '212 patent was sufficient to enable the claims of that patent, so, too, is the description of EMERALD 1997.” Id. (citing In re Epstein, 32 F.3d 1559, 1568 (Fed.Cir.1994)). Besides the similarities between the disclosures, the district court accepted SRI’s broad construction of “statistical detection method” to “encompass [ ] any method of detecting suspicious activity by ‘applying one or more statistical functions’ to analyze network traffic data.” SRI Int'l, Inc., 456 F.Supp.2d at 634. Because SRI asserted that a variety of statistical functions fall within the scope of the '212 patent, the district court found that a person of ordinary skill in the art would find the EMERALD 1997 paper enabling with respect to the invention. Id. The district court clarified that a person of ordinary skill in this art field would have a background in computer science, electrical engineering, or computer engineering as well as knowledge of cyber and internet security. Id. at 630.
SRI asserts that the EMERALD 1997 paper is not an enabling disclosure and does not anticipate the claims of the '212 patent because implementing the EMERALD 1997 concepts required extensive and undue experimentation. In particular, SRI points to the declaration of one of the '212 inventors, Mr. Porras, that the 1997 paper was completed just at the outset of the EMERALD project. After the 1997 paper, SRI itself engaged in a great deal of time, effort, and research before achieving a workable system. Dr. Kesidis, SRI’s expert, also explained that the EMERALD 1997 paper was a mere statement of intent to try several prior art techniques and would not have enabled one of ordinary skill in the art to make a functional system.
The Defendants respond that one of ordinary skill in the art, without undue experimentation, could have combined the teachings in EMERALD 1997 with general knowledge in the art to practice the invention using any species of the statistical detection method. See Elan Pharm., Inc. v. Mayo Found., 346 F.3d 1051, 1054-55 (Fed.Cir.2003). Furthermore, the Defendants contend that substantial evidence from a number of different sources, including references in the '212 patent, confirmed that statistical detection methods were known in the art and used to analyze network traffic data. See, e.g., Valdes, et ah, “Statistical Methods for Computer Usage Anomaly Detection using NIDES (Next-Generation Intrusion Detection Expert System),” 3rd International Workshop on Rough Sets and Soft Computing, San Jose, CA 1995, 306-11 as listed in the Other Publications section of the '212 patent. In sum, the Defendants contend that a person of ordinary skill in the art was capable of applying a statistical methodology in the analysis of network traffic data before the date of the '212 claimed invention.
This court discerns that the district court correctly determined that the EMERALD 1997 paper enabled one of ordinary skill in the art to practice the claimed invention. Based on the '212 patent specification, the EMERALD 1997 paper, and the record before the district court, no reasonable jury could conclude that the EMERALD 1997 paper did not enable statistical profiling of network traffic.
Both the '212 patent specification and the EMERALD 1997 paper contain similar sections explaining statistical detection. For example, both the specification and the publication contain similar descriptions *1194 of the use of NIDES algorithms for statistical detection. Furthermore, the identical figures are a graphical depiction of a network monitor to scrutinize an event stream and a diagram of a resource object that configure the network monitor. These figures show an architecture for network monitoring based on a profile engine and configurable event structures sufficient to enable one skilled in the art.
Indeed, these disclosures helped the inventors obtain issuance of the '212 patent. The issuance itself shows that the specification satisfied the enablement requirements of 35 U.S.C. § 112, ¶ 1. With the 1997 paper providing similar, or even a partially identical, disclosure to the '212 patent specification, the record meets the lower enablement standard for prior art under 35 U.S.C. § 102(b). Thus, the 1997 publication with its similarities in technical scope and description to the specification of the '212 patent meets the enabling hur-
dle for a prior art reference. See Constant v. Advanced Micro-Devices, Inc., 848 F.2d 1560, 1569 (Fed.Cir.1988) (“The disclosure in Exhibit 5 is at least at the same level of technical detail as the disclosure in the '491 patent. If disclosure of a computer program is essential for an anticipating reference, then the disclosure in the '491 patent would fail to satisfy the enablement requirement of 35 U.S.C. § 112, First ¶.”)
Dr. Kesidis’s testimony is not sufficient to overcome the weight of evidence that the EMERALD 1997 paper offers an enabling disclosure for § 102(b). His testimony contains only generalized conclusions without any analysis regarding the alleged differences between the '212 patent disclosure and the EMERALD 1997 paper. In short, Dr. Kesidis just restated SRI’s position. As such, SRI’s only semblance of possible evidence to show a lack of an enabling disclosure in the EMERALD 1997 paper was not sufficient to create a genuine issue of material fact. Therefore, this court affirms the district court’s ruling, as a matter of law, of invalidity of the '212 patent as anticipated by the EMERALD 1997 paper.
B. The Live Traffic Paper
This court must determine the accessibility to the public of the Live Traffic paper before the critical date. If this paper qualifies as prior art, the parties agree that its disclosure renders the asserted patents (’203, '338, '212, and '615) invalid under 35 U.S.C. § 102(b). The 35 U.S.C. § 102 printed publication bar states: “A person shall be entitled to a patent unless — (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States....” 35 U.S.C. § 102(b)(emphasis added). “The bar is grounded on the principle that once an invention is in the public domain, it is no longer patentable by anyone.” Application of Bayer, 568 F.2d 1357, 1361 (C.C.P.A.1978).
“Because there are many ways in which a reference may be disseminated to the interested public, ‘public accessibility’ has been called the touchstone in determining whether a reference constitutes a ‘printed publication’ bar under 35 U.S.C. § 102(b).” In re Hall, 781 F.2d 897, 898-99 (Fed.Cir.1986) (emphasis added). “A given reference is ‘publicly accessible’ upon a satisfactory showing that such document has been disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it.” Bruckelmyer v. Ground Heaters, Inc., 445 F.3d 1374, 1378 (Fed.Cir.2006). “The decision whether a *1195 particular reference is a printed publication ‘must be approached on a case-by-case basis.’ ” In re Cronyn, 890 F.2d 1158, 1161 (Fed.Cir.1989) (internal quote from In re Hall, 781 F.2d 897, 899 (Fed.Cir.1986)); see also In re Wyer, 655 F.2d 221, 227 (C.C.P.A.1981) (“Decision in this field of statutory construction and application must proceed on a case-by-case basis.”).
The district court granted summary judgment of invalidity under § 102(b) as to all four patents-in-suit. The district court based its summary judgment ruling on its interpretation of the evidentiary record. According to the district court, the eviden-tiary record “indicates that the ftp://ftp.csl.sri.com site was publicly accessible.” SRI Int’l, Inc., 456 F.Supp.2d at 629. Furthermore, the district court determined that the evidence clearly showed “Mr. Porras provided this [aforementioned] FTP site to other members of the intrusion detection community both in presentations and via email.” Id. The district court thus determined that SRI’s FTP server’s directory structure gave access to the article to a person of ordinary skill in the art. Id. In the district court’s view, one of ordinary skill would know that the SRI FTP server contained information on the EMERALD 1997 project and therefore would navigate through the folders to find the Live Traffic paper. Id.
SRI asserted that, as a matter of law, the file on SRI’s FTP server containing the Live Traffic paper fell short of a publication under § 102(b). SRI contends that the Live Traffic paper sent to Dr. Bishop via email and placed on the FTP server for seven-days as a backup to this email was a private prepublication communication. SRI also asserts that the district court misread this court’s jurisprudence with respect to the ability of a person of ordinary skill to navigate the FTP server’s directory structure to find the Live Traffic paper. SRI contends that the ndss98.ps file name of the Live Traffic paper was not indexed or catalogued in any meaningful way to enable a person of ordinary skill to locate the paper.
The Defendants assert that the district court properly applied this court’s printed publication case law in finding that the Live Traffic paper was publicly accessible before the critical date. The Defendants point out that posting the Live Traffic paper to a publicly accessible FTP server made the paper publicly available to persons interested and skilled in the art. Furthermore, posting to a publicly accessible FTP server could not constitute a private transmission as alleged by SRI.
After review of the record, this court perceives factual issues that prevent entry of summary judgment of invalidity based on the Live Traffic paper. Specifically, this court does not find enough evidence in the record to show that the Live Traffic paper was publicly accessible and thus a printed publication under 35 U.S.C § 102(b).
This court’s case law has discussed public accessibility under § 102(b), in one line of cases illustrating a lack of public accessibility and in another line of cases pointing out public accessibility. For instance, Application of Bayer and In re Cronyn illustrate situations that do not warrant a finding of public accessibility. In re Wyer, In re Klopfenstein and the recently decided Bruckelmyer v. Ground Heaters, on the other hand, illustrate situations that found public accessibility.
From the perspective of cases lacking public accessibility, Bayer featured a graduate thesis in a university library. The library had not catalogued or placed the thesis on the shelves. Only three faculty members even knew about the thesis. Application of Bayer, 568 F.2d 1357, 1358-59 *1196 (C.C.P.A.1978). Under these circumstances, this court’s predecessor found that the thesis did not constitute a printed publication because a customary search would not have rendered the work reasonably accessible even to a person informed of its existence. Id. at 1361-62. Similarly, in In re Cronyn, the thesis document was in a library with an alphabetical index by the author’s name. This court found no public accessibility because “the only research aid in finding the theses was the student’s name, which of course, bears no relationship to the subject of the student’s thesis.” In re Cronyn, 890 F.2d 1158, 1161 (Fed.Cir.1989).
Several cases have also illustrated situations that rendered documents available to the public. For example, in Wyer, an Australian patent application was laid open to the public and “properly classified, indexed or abstracted” to enable public access to the application. In re Wyer, 655 F.2d 221, 226-27 (C.C.P.A.1981). Wyer explained various factors involved in the public accessibility determination, including intent to publicize and disseminating activities. Still the court emphasized: “Each [printed publication] case must be decided on the basis of its own facts.” Id. at 227. In Klopfenstein, two professional conferences displayed posters. These posters were printed publications because their entire purpose was public communication of the relevant information. In re Klopfenstein, 380 F.3d 1345, 1347-50 (Fed.Cir.2004). And, most recently, in Bruckelmyer, this court found that a Canadian patent application, properly abstracted, indexed and catalogued, was a printed publication under § 102(b). This court explained: “[T]he [Canadian] patent was classified and indexed, similar to the abstract in Wyer, further providing a road map that would have allowed one skilled in the art to locate the [patent] application.” Bruck-elmyer v. Ground Heaters, Inc., 445 F.3d 1374, 1379 (Fed.Cir.2006).
Based on this appeal record, this case falls somewhere between Bayer and Klop-fenstein. Like the uncatalogued thesis placed “in” the library in the Bayer case, the Live Traffic paper was placed “on” the FTP server. Yet, the FTP server did not contain an index or catalogue or other tools for customary and meaningful research. Neither the directory structure nor the README file in the PUB subdi-rectory identifies the location of papers or explains the mnemonic structure for files in the EMERALD subdirectory, or any subdirectory for that matter. In fact, the EMERALD subdirectory does not contain a README file. Further, the summary judgment record shows that only one non-SRI person, Dr. Bishop, specifically knew about the availability of the Live Traffic paper, similar to the knowledge of the thesis’s availability by the three professors in Bayer.
The record on summary judgment does not show that an anonymous user skilled in the art in 1997 would have gained access to the FTP server and would have freely navigated through the directory structure to find the Live Traffic paper. To the contrary, the paper’s author, Mr. Porras, thought it necessary to provide Dr. Bishop with the full FTP address for the file. Surely Dr. Bishop, the Program Chair for SNDSS, would have qualified as one of ordinary skill in the art in 1997. Yet, despite his knowledge of the field, FTP servers, and the paper, Dr. Bishop apparently would not have found the reference without Mr. Porras’s precise directions. It is doubtful that anyone outside the review committee looking for papers submitted to the Internet Society’s Symposium would search a subfolder of an SRI FTP server. These are separate entities. It is also doubtful that anyone outside the review *1197 committee would have been aware of the paper or looked for it at all in early August 1997. These facts seem to militate against a finding of public accessibility. At least they warrant examination upon remand.
In one respect, the public accessibility, factors are less compelling for the Live Traffic paper than they were for the thesis in Bayer. In Bayer, the thesis was complete and ready for public consumption, while the Live Traffic paper was still subject to pre-publication review. The Live Traffic paper was not a finished thesis, but was posted on the FTP server solely to facilitate peer review in preparation for later publication.
On the other hand, similar to the posters in Klopfenstein, the Live Traffic paper was “posted” on an open FTP server and might have been available to anyone with FTP know-how and knowledge of the EMERALD subdirectory. Unlike the posters hung at a conference in Klopfen-stein, the Live Traffic paper was not publicized or placed in front of the interested public. In effect, the Live Traffic paper on the FTP server was most closely analogous to placing posters at an unpublicized conference with no attendees. The Live Traffic paper, like posters at a vacant and unpublicized conference, was available by being “posted,” but available only to a person who may have wandered into the conference by happenstance or knew about the conference via unpublicized means. Indeed the record does not show that anyone accessed the Live Traffic paper via the FTP server during the seven days in which it was posted. While actual retrieval of a publication is not a requirement for public accessibility, this record does not evince that the Live Traffic paper was accessible to anyone other than the peer-review committee, thus further suggesting an absence of actual public accessibility. See Constant v. Advanced Micro-Devices, Inc., 848 F.2d 1560, 1569 (Fed.Cir.1988).
The record reflects seven instances in which Mr. Porras previously directed people to the /pub/emerald subdirectory to find other papers related to the EMERALD project. In four instances, Mr. Por-ras provided the full path and filename of the paper, presumably to provide an adequate research aid for a user to locate the paper. In every instance, Mr. Porras directed the people to a specific paper, which included the term “emerald” in the filen-ame. In this case, there was no such specific direction, and the filename did not mimic the subdirectory or publicized project name. Thus, the record offers no suggestion that because people had been told that they could find other papers in the past in the /pub/emerald subdirectory, they would — unprompted—look there for an unpublicized paper with a relatively obscure filename.
The current record leaves the Live Traffic paper on the Bayer non-accessible side of this principle, not on the Klopfenstein side of public accessibility. Therefore, on summary judgment, this court finds that the prepublication Live Traffic paper, though on the FTP server, was not cata-logued or indexed in a meaningful way and not intended for dissemination to the public. See In re Wyer, 655 F.2d 221 (C.C.P.A.1981); Application of Bayer, 568 F.2d 1357 (C.C.P.A.1978); In re Klopfenstein, 380 F.3d 1345, 1347-50 (Fed.Cir.2004).
The FTP server directory structure (/pub/emerald/) of a well-known institution in the intrusion detection community and the acronym of “ndss98.ps” might have hinted at the path to the Live Traffic paper; however, an unpublicized paper with an acronym file name posted on an FTP server resembles a poster at an unpublicized conference without a conference *1198 index of the location of the various poster presentations. As noted, the peer-review feature also suggests no intent to publicize. Without additional evidence as to the details of the 1997 SRI FTP server accessibility, this court vacates and remands for a more thorough determination of the publicity accessibility of the Live Traffic paper based on additional evidence and in concert with this opinion.
Ill
CONCLUSION
This court affirms the district court’s grant of summary judgment as to the invalidity of the '212 patent based on the EMERALD 1997 paper. However, this court vacates and remands the district court’s summary judgment ruling of invalidity based on the Live Traffic paper because of genuine issues of fact about public accessibility.

AFFIRMED-IN-PART, VACATED AND REMANDED-IN-PART.

COSTS
Each party shall bear its own costs.

. "FTP is a protocol for exchanging files over any computer network that supports the TCP/IP protocol [such as the internet]”. SRI Int’l, Inc., 456 F.Supp.2d at 626 n. 7.

. Two defendants have the name “Internet Security Systems, Inc.,” one a Delaware corporation and one a Georgia corporation. For purposes of this opinion, they shall collectively be referred to as "ISS”.